**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PAUL E. ARLTON**, an individual, | |
| 7239 Spoonbill Lane | |
| Carlsbad, CA 92011 | CASE NO. 24-1646 |
| Plaintiff, | |
| v. | **COMPLAINT FOR INJUNCTIVE RELIEF** |
| **THE NATIONAL AERONAUTICS AND SPACE ADMINISTRATION,** an agency of the United States Government, | |
| 300 Hidden Figures Way SW | |
| Washington, DC 20024 | |
| and | |
| **THE JET PROPULSION LABORATORY,** a federally funded research and development center, | |
| 4800 Oak Grove Drive, M/S 300-323 | |
| Pasadena, CA 91109 | |
| Defendants. | |

**COMPLAINT**

Plaintiff, Paul Arlton, by and through counsel, initiates this action against Defendants, the National Aeronautics and Space Administration ("NASA") and the Jet Propulsion Laboratory ("JPL") under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and alleges as follows:

**INTRODUCTION**

1.     This Complaint, brought pursuant to the FOIA, concerns the clear failure of NASA and JPL to comply with the FOIA in responding to record requests submitted by Plaintiff related

to the Mars Helicopter Ingenuity. The Mars Helicopter Ingenuity is a small electric powered coaxial-rotor helicopter drone that made the historic first flight on the planet Mars in 2021.

2.      As set forth in Plaintiff's FOIA appeal dated February 16, 2023, in the early 2000's, Plaintiff Paul Arlton and his brother David Arlton (the "Arltons") invented and patented an electric powered coaxial-rotor unmanned aerial vehicle called the Tiger Moth UAV (also called the Tiger Moth drone) that solved the fundamental problems associated with traditional coaxial rotor helicopters. For over 10 years the Government developed the Arlton's patented technology in the federal Small Business Innovation Research ("SBIR") program using public funds. *See* Exhibit 5, pp. 1-2 (background of FOIA appeal).

3.      The Mars Helicopter Ingenuity is a functional duplicate of the Arltons' Tiger Moth drone and infringes the Arltons' United States Patent No. 8,042,763 B2 ("the '763 Patent"). *Id*; *See* Exhibit 1A, p. 1 (showing that the essential elements of the Mars Helicopter Ingenuity – the airframe, rotor control and propulsion systems – are identical to those described in the '763 patent); *see also* Exhibit 1D, p. 4 (rotor system design). Thus, the Arltons invented and patented the revolutionary helicopter technology that enabled the Mars Helicopter Ingenuity to fly on Mars 16 years before its historic first flight on Mars. *See* Exhibit 2, p. 1 (showing original filing date of '763 patent application as April 14, 2005).

4.      JPL is a federally funded research and development center ("FFRDC") that manages the Mars Helicopter program for NASA. Exhibit 35, p. 6.

5.      JPL's subcontractor, AeroVironment, Inc, designed and built significant portions of the Mars Helicopter Ingenuity using the Arltons' patented technology. *See* Exhibit 1A, p. 1; Exhibit 1D (describing AeroVironment's work on Mars Helicopter airframe, rotor control and propulsion systems).

6.      In February 2021, Defendant NASA retroactively authorized and consented to AeroVironment's use of the '763 Patent for the Mars Helicopter Ingenuity under 28 U.S.C. § 1498. *See* Exhibit 3, pp. 1-2.

7.    By way of this retroactive authorization and consent, the Government purportedly accepted liability for all acts of patent infringement alleged by the Arltons. *See* Exhibit 3, p. 2.

8.    Plaintiff filed his FOIA request to access additional documents relating to Defendants' use of the '763 Patent and to expose the massive waste of public funds associated with Defendants' development of the Mars Helicopter Ingenuity.

9.    Further, Plaintiff adamantly contends that the American public deserves to know the true story underpinning the development of the Mars Helicopter Ingenuity and the first powered, controlled flight on another planet, which ultimately won the 2021 Collier Trophy for the greatest achievement in aeronautics or astronautics in America. *See* Exhibit 28.

10.    Plaintiff filed his initial FOIA request, 22-JPL-F-00004, on October 4, 2021. *See* Exhibit 4. Between October 2021 and March 2023, Defendants released seven (7) interim responses, which contained improper redactions and did not address the majority of Plaintiff's request. *See* Exhibit 8, pp. 1-2.

11.    Plaintiff filed his appeal of these interim responses, 23-00009-A-OGC, on February 16, 2023. *See* Exhibit 5; Exhibit 6, p. 1 (assigning new appeal number 23-00009-A-OGC).

12.    Defendants issued a final determination letter in May 2023 but addressed only one of the interim responses. *See* Exhibit 6, p. 4. Significant portions of Plaintiff's request remained unaddressed.

13.    Hoping to resolve the outstanding issues, Plaintiff supplemented his appeal in June 2023 providing clarification and an index of improperly withheld information. *See* Exhibit 7.

14.    Defendant NASA issued another final determination letter on November 2, 2023 granting in part, denying in part, and remanding Plaintiff's appeal to JPL's FOIA Office for further processing. *See* Exhibit 8, pp. 2, 14.

15.    Plaintiff responded less than three weeks later on November 20, 2023, notifying Defendants of many errors in their review. *See* Exhibit 9 (noting that Defendants have asserted confidentiality exemptions for information that Defendants have already widely published).

16.     Since that time, JPL has released only one additional response on February 22, 2024. *See* Exhibit 11.

17.     It has now been over two and a half years since Plaintiff originally filed his FOIA request. Plaintiff still has not received any records relating to large swaths of his request, and much of what Plaintiff has received contains redactions supported by improperly claimed exemptions.

18.     Defendants have thus failed to respond to Plaintiff's requests within the statutory time period required by 5 U.S.C. § 552(a)(6)(A), withheld and improperly redacted records through the assertion of inapplicable exemptions in violation of 5 U.S.C. § 552(a)(3)(A), failed to conduct an adequate search for the requested records in violation of 5 U.S.C. § 552(a)(3)(C), and failed to produce segregable information in violation of 5 U.S.C. § 552(b) and 5 U.S.C. § 552(a)(8)(A)(ii).

19.     Defendants' handling of Plaintiff's request contravenes many of the basic principles underpinning the FOIA, which is based on the belief that an informed citizenry is essential to the functioning of a democratic society. Moreover, the FOIA is designed to remove barriers to accessing government records and promote the presumption of openness in government operations. *See* Exhibit 12, pp. 1-3 (memorandum from the United States Attorney General outlining these directives and discussing FOIA guidelines).

20.     Defendants' delayed and improperly redacted responses directly contravene the stated goals of the FOIA and the Attorney General's explicit guidelines.

21.     Accordingly, Plaintiff requests that the Court review the Defendants' responses to Plaintiff's FOIA requests and order Defendants to produce the requested records, remove improper redactions, and reimburse Plaintiff for the reasonable costs and attorneys' fees of this suit.

## PARTIES

22.     Plaintiff Paul Arlton is an aerospace engineer with a master's degree in business administration from Stanford University and is a resident of the county of San Diego, State of California. His principal place of residence is in Carlsbad, California. He and his brother, David

Arlton, are inventors and developers of technology related to rotary wing vehicles and, in particular, to small unmanned aerial vehicles ("UAVs") or drones.

23.    Defendant NASA is an "agency" within the meaning of 5 U.S.C. § 552(f) with a principal place of business at 300 Hidden Figures Way SW, Washington, DC, 20024. NASA has possession and control over all records requested herein.

24.    Defendant JPL is a federally funded research and development center ("FFRDC") owned and sponsored by NASA and managed by the California Institute of Technology ("Caltech") with a principal place of business at 4800 Oak Grove Drive in Pasadena, California. JPL receives the entirety of its federal funding through NASA.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B), 28 U.S.C. § 1331, and the equitable powers inherent in the courts of the United States.

26.    Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331, as NASA's principal place of business is in Washington, DC.

## FACTUAL BACKGROUND

### The Arltons' Drone Technology

27.    In the early 2000's, Paul and David Arlton invented and patented an electric-powered coaxial-rotor helicopter drone that solved the fundamental problems associated with traditional coaxial rotor helicopters. The Arltons' revolutionary design reduced the complexity of existing coaxial-rotor helicopters by 90% and resulted in the most efficient hovering machine in the world. *See* Exhibit 2.

28.    Since 2005, the Arltons have obtained 68 domestic and international patents related to coaxial-rotor helicopter drones. Their company, Lite Machines Corporation ("Lite"), has received over $30 million in Small Business Innovation Research ("SBIR") awards to develop and demonstrate the Arltons' patented drone technologies for the Navy, Air Force, Army, NASA, and Special Operations Command. The Arltons' unique coaxial-rotor helicopter drones are known as

"Voyeur" drones to the Navy and "Tiger Moth" drones to all other government agencies. *See* Exhibit 5, p. 1.

29.     In 2010, Lite was awarded an SBIR Phase III contract by the Air Force and the United States Special Operations Command (the "2010 Contract") to refine the stability and control system of the Tiger Moth drone with the Army helicopter scientists at NASA Ames. Exhibit 1, ¶¶ 7, 10-11.

30.     In May 2012, Plaintiff Paul Arlton presented the final report for the 2010 Contract titled "*Control System Development and Flight Testing of the Tiger Moth UAV*" to hundreds of scientists and engineers at the American Helicopter Society's 68th Annual Forum in Fort Worth, Texas. Exhibit 1, ¶ 13; Exhibit 1C, p. 1.

### The Mars Helicopter Ingenuity

31.     In 2013, JPL and its primary commercial contractor, AeroVironment, submitted a proposal to NASA to build a helicopter drone called the "Heli-Scout" for a demonstration flight on Mars. JPL's proposal, however, was not funded by NASA for any science mission.

32.     In November 2013, JPL funded AeroVironment to build a small prototype of the Heli-Scout for testing at JPL to demonstrate that a helicopter could lift itself in the thin atmosphere on Mars. *See* Exhibit 13; *see also* Exhibit 16, pp. 2-3, 7 (JPL subcontract 1494045 to AeroVironment for Heli-Scout identifying total fixed price of $49,257). Prior to working on the Heli-Scout, AeroVironment's chief engineer for the Heli-Scout, Matthew Keennon, was an avid modeler and an electronics technician in AeroVironment's model shop but he worked primarily with model airplanes and had little if any experience with helicopters. *See* Exhibit 14, pp. 4, 6-7.

33.     Keennon's prototypes of the Heli-Scout were small stick-like models weighing just a few ounces. *See* Exhibit 17. Designed to demonstrate lift (i.e., vertical flight), Keennon's prototypes lacked any sort of pitch-roll control system (which is required for horizontal flight). Without pitch-roll control Keennon's prototypes were unstable, uncontrollable and would always

"crash spectacularly" when Keennon flew them at JPL. *See* Exhibit 14, p. 7; Exhibit 18, p. 5; Exhibit 30, ¶ 6.

34.    In a radical departure from AeroVironment's previous work with JPL, Keennon built a much larger prototype called the "Engineering Model" in 2015 which, at four pounds, matched the physical size, weight, and operational characteristics of the Tiger Moth drone that Plaintiff demonstrated at the American Helicopter Society's 68th Annual Forum in 2012. *See* Exhibit 1C, p. 1; Exhibit 19. Notably, Keennon had attended the same conference in 2012 to present a technical paper and demonstrate a small drone for AeroVironment. *See* Exhibit 15.

35.    Keennon's Engineering Model contained glaring technical deficiencies that rendered it incapable of successfully performing its intended mission on Mars. *See* Exhibit 19; Exhibit 22, p. 4. It was inherently unstable and uncontrollable under real-world conditions because Keennon omitted pitch-roll control of the upper rotor blades as he had done on his earlier stick-like prototypes of the Heli-Scout. *See* Exhibit 21, p. 4; Exhibit 22, p. 4. To simulate the lower gravity on Mars, however, JPL attached a thin gravity assist wire to the top of Keennon's Engineering Model that supported two-thirds of its weight and prevented it from oscillating wildly out of control and crashing during demonstration flights. *See* Exhibit 21, pp. 16-17 (describing gravity offload system), Exhibit 22, p. 4, Fig. 4 (showing "safety tether").

36.    Further, like his earlier prototypes, Keennon's Engineering Model lacked a practical airframe and propulsion system. Keennon drove both the upper and lower rotor blades with a single electric motor through a complex and impractical assemblage of drive shafts and reversing gears appended to the exterior of the helicopter's body structure. *See* Exhibit 19; Exhibit 21, pp. 4, 15 (describing structural differences between Engineering Model and final design). This is much like mounting the engine, drive shaft and transmission of a car on the *outside* of the car instead of under the hood attesting once again to Keennon's inexperience in helicopter design.

37.    Throughout 2016 and 2017, scientists and engineers at NASA and around the world analyzed Keennon's Engineering Model and published their results in technical papers and scientific journals. Their results were identical to those previously published by Plaintiff in 2012:

Coaxial-rotor helicopters like Keennon's Engineering Model **must** include pitch-roll control of the upper rotor as shown in Arltons' patents – it's a natural and unavoidable consequence of the laws of physics. *See* Exhibit 22, p. 4 (lack of cyclic control on upper rotor causes cross-axis coupling between the rotors), p. 20 (helicopters in forward flight exhibit faster instabilities due to cross-axis coupling which is mitigated by cyclic control of upper rotor); Exhibit 23, p. 3 (cyclic control of only lower rotor results in reduced control authority and cross-coupling between the rotors).

38.     Late in 2017, after struggling with Keennon's flawed designs for four years, AeroVironment copied the Arltons' technology – including the airframe, rotor control and propulsion systems described in Arltons' patents and patent applications – to produce the Mars Helicopter Ingenuity that ultimately flew on Mars for almost three years. *See* Exhibit 1, ¶¶ 20-21; Exhibit 1A, p. 1 (showing mast tube airframe, upper and lower servos and swashplates, and upper and lower propulsion motors). Notably, Defendant NASA has admitted as much by retroactively authorizing and consenting to AeroVironment's use of the Arltons' '763 Patent in its 2021 Statement of Interest. *See* Exhibit 3.

39.     The Mars Helicopter Ingenuity bears little resemblance to the stick-like models that Keennon initially designed, as evidenced by the NBC Channel 4 News segment below.[1]

---

[1] Miller Hyatt, *Here Are Ways to Get Involved In NASA's Mars Rover Launch*, NBC Los Angeles, Jul. 28, 2020, https://www.nbclosangeles.com/news/national-international/here-areways-to-getinvolved-in-nasas-mars-rover-launch/2403611/, (last visited May 10, 2024).



40.     Unlike the Mars Helicopter Ingenuity, Keennon's small stick models lacked any sort of pitch-roll control system as can be seen clearly in images published by the Wall Street Journal (below).[2] For comparison, Fig. 15 of the Arltons' '763 Patent (also below) shows the pitch-roll control system of the Tiger Moth drone. Without pitch-roll control, Keennon's prototypes were unstable, uncontrollable and could not fly on any planet without crashing. *See* Exhibit 14, p. 7; Exhibit 18, p. 5; Exhibit 30, ¶ 6. This is much like a race car with no steering − it's doomed to crash no matter how skilled the driver.

---

[2] *How NASA's Ingenuity Helicopter Was Developed for Mars*, THE WALL STREET JOURNAL, at 3:26-4:14, https://www.youtube.com/watch?app=desktop&v=z59Fn6FadCM, (last visited May 10, 2024).

**Keennon's Stick-Like Model**



**Arltons' U.S. Pat. No. 8,042,763**

**NASA's Authorization and Consent to Patent Infringement**

41.    In 2020, the Arltons were astonished to see their patented technology prominently displayed on the evening news and filed suit in the United States District Court for the Central District of California, alleging that AeroVironment used the same patent for the Mars Helicopter Ingenuity (the '763 patent) that the Arltons had licensed to Lite for its SBIR programs involving the Tiger Moth drone. *See* Exhibit 1, ¶¶ 5, 20-21; Exhibit 31, p. 2. The declaration of Paul Arlton filed in that suit included a comparison of the Mars Helicopter Ingenuity and the '763 patent showing identical airframe, rotor control and propulsion systems. *See* Exhibit 1A, p. 1.

42.    In February 2021, NASA retroactively authorized and consented to AeroVironment's use of the Arltons' patents for the Mars Helicopter Ingenuity under 28 U.S.C. § 1498. *See* Exhibit 3. Consequently, the Arltons have also sought to have their patent claims heard in the Court of Federal Claims. *See Lite Machines Corp. v. United States*, 143 Fed. Cl. 267 (May 21, 2019) (filed Sept. 14, 2018 and amended January 28, 2022 to incorporate the Arltons' patent claims).

43.    To date, the Arltons have been unable to advance their patent infringement claims in either the district court or the Court of Federal Claims as the issue of jurisdiction is currently on appeal to the Federal Circuit.

**Defendants' Scientific Claims Regarding Flight on Mars**

44.    According to press releases and research papers published by the Defendants, JPL's Chief Engineer, Bob Balaram, and JPL's Program Manager, Mimi Aung, directed technical development of the Mars Helicopter Ingenuity from its inception to its final demonstration flights on Mars. *See* Exhibit 13.

45.    Balaram and Aung have widely claimed that stability and control of a helicopter on Mars is different than on Earth because of the "thin Martian atmosphere" (which is about 1% of the density of the atmosphere on Earth at sea level). Exhibit 25, slides 7, 15. As definitive proof, they point to the early flight tests of Keennon's stick-like models that would always "crash

spectacularly" when tested at JPL. *See* Exhibit 25, slide 15; Exhibit 30, ¶ 6. On a nationally televised segment of *60 Minutes with Anderson Cooper* titled *Perseverance rover, Ingenuity helicopter, and the search for ancient life on Mars,* Aung pointed to video footage of Keennon's stick-like prototype crashing in JPL's test chamber as proof that on Mars "a human being can't respond quickly enough to control it."[3] Significantly, Aung did not inform Cooper that Keennon's prototype lacked a pitch-roll control system *and could not be controlled by a pilot on either Earth or Mars*.

46.     To overcome the purported difficulties associated with stabilizing and controlling a helicopter on Mars, JPL employed 150 scientists and engineers over five years and spent over **$85 million** of public funds developing and demonstrating an all-new electronic flight control system for the Mars Helicopter Ingenuity. *See, e.g.,* Exhibit 21, pp. 4-7 (describing JPL' avionics and flight software), pp. 14-17 (Section X. Control); *see also* Exhibit 22, pp. 5-8 (Section IV. Guidance and Control Architecture), pp. 15-19 (Section IX. Control Design and Analysis); Exhibit 25, slide 3.

47.     JPL's electronic flight control system includes a super-computer capable of almost 10,000,000,000 (ten billion) computations per second making it "100 times more powerful than *everything* JPL has sent into deep space *combined*." Exhibit 26, p. 1 (emphasis added). Balaram and Aung claim that flight on Mars would be impossible without it. Aung explained on *60 Minutes with Anderson Cooper* that, unlike Keennon's stick-like prototypes, Keennon's Engineering Model could fly in JPL's Martian test chamber only because "the blades are being commanded, you know, four or five hundred times per second" by JPL's electronic flight control system. *60 Minutes with Anderson Cooper* at 4:50-5:11; *see* Exhibit 21, p. 7, Fig. 7 (showing actuator commands generated by flight controller at 500 Hz).

---

[3] *Perseverance rover, Ingenuity helicopter, and the search for ancient life on Mars*, 60 MINUTES WITH ANDERSON COOPER, May 9, 2021, at 4:26-4:53, https://www.youtube.com/watch?v=gRrFRL5v0ig (last accessed May 10, 2024).

**Ongoing Infringement and Waste of Public Funds**

48.    Plaintiff, however, alleges that Keennon's spectacular crashes and ongoing problems with helicopter stability and control − which Balaram and Aung have repeatedly used to justify JPL's **$85 million** development effort − were due solely to Keennon's faulty understanding of helicopter flight dynamics and lack of helicopter design experience, not to the thin atmosphere on Mars.

49.    Plaintiff further alleges that Balaram, Aung, and Keennon have conspired to falsify Keennon's flight test results and perpetuate a scientific myth that stability and control of a helicopter on Mars is fundamentally more difficult than on Earth to protect their professional reputations, justify the unnecessarily high cost of the Mars Helicopter program, and secure continued public funding for future Mars Helicopter research and development efforts.

50.    In a sworn declaration filed in the Arltons' patent infringement suit, Keennon stated: "While AeroVironment has prototypes that it developed as part of its work designing Ingenuity, *those prototypes are adapted to flight on Mars and crash spectacularly when used as a demonstration here on Earth.*" Exhibit 30, ¶ 6 (emphasis added). Thus, Keennon claims that the prototypes he designed and built for JPL could not be flown on Earth *because they were specially designed for flight on Mars.*

51.    As discussed above, however, Keennon's prototypes lacked pitch-roll control which is essential for helicopter flight. Consequently, his designs were unstable, uncontrollable and *could not fly on any planet without crashing*. Indeed, Keennon's stick-like prototype shown crashing spectacularly on *60 Minutes with Anderson Cooper* clearly lacked a pitch-roll control system. *60 Minutes with Anderson Cooper* at 4:33-4:54. As program manager for the Mars Helicopter program at JPL for six years, Aung knew the difference between Keennon's early prototypes (which lacked pitch-roll control) and the Mars Helicopters Ingenuity (which employed Arltons' patented rotor control technology) when Cooper interviewed her in 2021. Yet, Aung purposefully misled Cooper and his national audience to believe that Keennon's crashes

constituted scientific evidence that controlled flight on Mars was more difficult than on Earth. In truth, Keennon's crashes simply demonstrated that he did not know how to design a helicopter.

52.     Aung also misled Cooper and the American public to believe that the Mars Helicopter Ingenuity can fly on Mars only because its rotor blades receive four to five hundred control commands per second from JPL's electronic flight control computer. Notably, however, the servo actuators controlling the rotor blades of the Mars Helicopter Ingenuity can produce only 12 control motions per second. Exhibit 22, p. 15; Exhibit 24, pp. 1, 3, 6 (describing servo bandwidth and rotor actuation at 12 Hertz which translates to 12 control motions per second). Any control commands generated by Ingenuity's flight control computer above this value (i.e. 12) are simply ignored by Ingenuity's servos actuators *because Ingenuity's servos are physically incapable of moving any faster*. This contradicts Aung's claim that 400 to 500 control commands per second are necessary for flight control on Mars.

53.     Like the Mars Helicopter Ingenuity, the servo actuators controlling the rotor blades on the Tiger Moth drone (which are standard commercial servos) are capable of producing about 12 control motions per second. Thus, the servo actuators that move the rotor blades on the Mars Helicopter Ingenuity and the Tiger Moth drone have similar functional characteristics. This is strong evidence that stabilizing and controlling a helicopter on Mars is no more difficult than on Earth.

54.     In 2021, AeroVironment built an exact replica of the Mars Helicopter Ingenuity named "Terry" at private expense for its own use here on Earth. S*ee* Exhibit 27; Exhibit 30, ¶¶ 5-7. In his sworn declaration for the Arltons' patent infringement suit, Keennon stated that, "Terry is almost a carbon copy of Ingenuity, with small adjustments having been made to make it capable of flying in Earth's atmosphere. However, true to its lineage, *Terry is also capable of flying in the Martian atmosphere, just like Ingenuity*." Exhibit 30, ¶ 5 (emphasis added).

55.     AeroVironment, however, did not use JPL's super-computer for Terry. Instead, AeroVironment used a commercial flight controller designed for hobby drones. *See* Exhibit 31, p. 3 (describing Terry as manually controlled by a pilot with a hand controller which is part of a

commercial flight control system). This suggests that JPL could have stabilized and controlled the Mars Helicopter Ingenuity on Mars with a commercial flight control system and commercially available software for hobby drones.

56.     In addition, the Mars Helicopter Ingenuity embodies the Arltons' patented technology and is functionally identical to the Tiger Moth drone. *See* Exhibit 1A, p. 1-2. According to technical data published by JPL and AeroVironment, the Mars Helicopter Ingenuity weighs four pounds, and operates at a rotor speed of 2400 RPM on Mars. *See* Exhibit 25, slide 22. While almost identical in size, the Tiger Moth drone weighs three and a half pounds and operates at rotor speeds between 1500 RPM and 3000 RPM on Earth. *See* Exhibit 1C, p. 1 (describing Tiger Moth weight) (rotor speed drawn from Plaintiff's unpublished technical data). This is strong evidence that, with small adjustments, *the Tiger Moth drone is also capable of flying in the Martian atmosphere, just like Ingenuity and Terry*. The Tiger Moth drone, however, is stabilized and controlled by a $40 micro-controller (a small computer chip commonly found in household appliances and automotive applications). This suggests that JPL could have flown the Mars Helicopter Ingenuity on Mars with a low-cost micro-controller.

57.     Thus, the available scientific evidence indicates that JPL's super-computer was unnecessary for flight on Mars and was simply an overreaction by two helicopter neophytes (Balaram and Aung) to the erratic flight performance of Keennon's faulty prototypes. This undermines the Defendants' widely published rationale for funding the Mars Helicopter program in the first place and suggests that the program was an enormous waste of public funds.

**AeroVironment's Self-Serving Declarations**

58.     Plaintiff asserts that Defendants' subcontractor, AeroVironment, has demonstrated a pattern of dishonesty and untrustworthy behavior regarding the development of the Mars Helicopter by making materially false statements under oath, concealing relevant information from the Court, and perpetuating scientific falsehoods as discussed below.

59.    As previously discussed, late in 2017, AeroVironment copied the Arltons' technology described in Arltons' patents and patent applications to produce the Mars Helicopter Ingenuity. *See* Exhibit 1, ¶¶ 20-21; Exhibit 1A, p. 1 (showing mast tube airframe, upper and lower servos and swashplates, and upper and lower propulsion motors).

60.    On August 17, 2020, the Arltons filed suit against AeroVironment alleging that AeroVironment used the same patent for the Mars Helicopter Ingenuity (the '763 Patent) that the Arltons had licensed to Lite for its SBIR programs involving the Tiger Moth drone. Exhibit 1, ¶¶ 5-6, 20-21; Exhibit 31, p. 2.

61.    On September 10, 2020, AeroVironment filed an answer to the Arltons' patent infringement complaint asserting that "AeroVironment's actions that form the basis of this Complaint were undertaken with the express authorization and consent of the government" pursuant to 28 U.S.C. § 1498. Exhibit 29, p. 15. To bolster its Section 1498 defense, AeroVironment further advised the district court that AeroVironment had used the Arltons' patent *exclusively* for the Mars Helicopter Ingenuity and nothing else. *See* Exhibit 31, p. 3.

62.    Based on AeroVironment's voluntary declaration that it had not used Arltons' patents for its own purposes, the district court dismissed Arltons' patent infringement complaint against AeroVironment.

63.    On May 9, 2021, however, just three days after the district court dismissed the Arltons' patent infringement complaint, AeroVironment announced on a nationally televised segment of *60 Minutes with Anderson Cooper* that AeroVironment had built an exact replica of the Mars Helicopter Ingenuity named "Terry" for its own private use here on Earth. *See* Exhibit 31, p. 3. And like the Mars Helicopter Ingenuity, the Terry Helicopter used the Arltons' '763 Patent.

64.    In a rare reversal, the district court vacated its judgment for AeroVironment and reinstated Arltons' patent infringement suit citing AeroVironment's failure to disclose Terry to the Arltons and the district court during discovery. *See* Exhibit 31, pp. 3, 5-7. This suggests that

AeroVironment's voluntary declarations regarding the Mars Helicopter and Terry are untrustworthy.

65.     Plaintiff contends that AeroVironment's self-serving declarations asserting FOIA exemptions 3, 4, and 6 in the instant case are equally untrustworthy, that AeroVironment has been improperly asserting FOIA exemptions to insulate Keennon and others from public scrutiny and to protect AeroVironment's public reputation, and that the Defendants have knowingly relied on false declarations made by AeroVironment to improperly withhold otherwise releasable records from Plaintiff.

<b>Plaintiff's FOIA Request and Defendants' Responses</b>

66.     On October 21, 2021, Plaintiff filed his original FOIA request to JPL regarding the Mars Helicopter program (FOIA Request 22-JPL-F-00004) to elicit information about JPL's and AeroVironment's development efforts and flight test results, and to demonstrate that Defendants wasted public funds by basing their research on the false premise that stabilizing and controlling a helicopter on Mars is more difficult than on Earth. The specific records requested are detailed in FOIA Request 22-JPL-F-00004, and supplemental information can be found in FOIA Appeal 23-00011-A-OGC. *See* Exhibits 4, 8.

67.     Between March 2022 and May 2023, Defendant JPL released records to Plaintiff on seven (7) occasions but failed to respond to several portions of Plaintiff's request. *See* Exhibit 8, pp. 1-2. Further, many records released by JPL included improper redactions as described below.

68.     By letter dated February 16, 2023, Plaintiff filed a timely appeal citing JPL's improper redactions and failures to respond (FOIA Appeal 23-00009-A-OGC). *See* Exhibit 5.

69.     By letter dated May 12, 2023, NASA issued a final determination letter addressing only one of JPL's seven interim responses to FOIA Request 22-JPL-F-00004. *See* Exhibit 6.

70.     By letter dated June 15, 2023, Plaintiff submitted supplemental information to Appeal 23-00009-A-OGC including an Index of Improperly Withheld Information (i.e., a Vaughn index) containing a brief description of the problems with each of JPL's improperly withheld

18

records and suggesting corrective actions. NASA designated this supplemental information FOIA Appeal 23-00011-A-OGC. *See* Exhibit 7.

71.     On November 2, 2023, NASA issued a final action on Appeal 23-00011-A-OGC granting in part and denying in part and then remanded the case to JPL for further processing. *See* Exhibit 8. As a result of this appeal, Defendant NASA ordered Defendant JPL to produce significant portions of exempted and redacted documents. Since that date, however, Plaintiff has received documents relating to only a single subcontract. *See* Exhibit 11.

72.     On November 20, 2023, Plaintiff filed a request to correct errors in NASA's final determination letter for Appeal 23-00011-A-OGC and provided JPL with additional guidance during remand regarding improper applications of FOIA exemptions by AeroVironment. *See* Exhibit 9 (identifying identical errors in NASA's review of 24 documents produced by JPL).

73.     On March 11, 2024, JPL sent its eighth interim release to Plaintiff which comprised a single subcontract to Qualcomm (with amendments) regarding testing of a Qualcomm computer chip. *See* Exhibit 11.

74.     JPL had previously released subcontracts to AeroVironment and other vendors in 2022 and did not provide any explanation to Plaintiff as to why it had not released its subcontracts with Qualcomm earlier.

75.     As of the date of filing of this complaint, Defendants have not corrected the errors that Plaintiff identified in Defendants' final determination letter for Appeal 23-00011-A-OGC or complied with the terms of the appellate remand by producing the records approved for release. Moreover, Defendant still has not addressed significant portions of Plaintiff's original request.

76.     In total, since Plaintiff's original request, Defendants have released interim responses on eight (8) occasions over a period of roughly two and a half years. *See* Exhibit 11 (regarding JPL's eighth interim response on February 22, 2024). These responses contained many instances of improperly claimed exemptions and did not address significant portions of the original request. *See, e.g.,* Exhibit 9, pp. 1, 3. (identifying identical errors in NASA's review of 24 documents).

77. Thus, Plaintiff alleges that Defendants have delayed their search for documents, failed to conduct an adequate search, improperly redacted documents, and improperly withheld agency records, all in order to protect their public image, justify the unnecessarily high cost of the Mars Helicopter program, and secure continued public funding for future Mars Helicopter research and development efforts.

78. In denying significant portions of Plaintiff's FOIA request, Defendants asserted exemption 3, which relates to non-disclosure provisions of federal statutes, exemption 4 which relates to confidential trade secrets and commercial or financial information, and exemption 6 which relates to unwarranted invasions of personal privacy. Exhibit 8, pp. 2-4.

79. Defendants have also claimed exemptions for "commercially sensitive" records, while at the same time claiming that the efforts behind the Mars Helicopter Ingenuity were undertaken with public funds for purposes of scientific advancement and not commercial gain. *See* Exhibit 8, p. 5 (withholding information based on AeroVironment's commercial interest); Exhibit 24, p. 1 (explaining that, "the Mars Helicopter is intended to demonstrate the technologies needed for meaningful planetary exploration", not commercial sale).

80. For example, Defendants have improperly asserted exemption 4 to withhold technical specifications (i.e. rotor diameter and weight) of AeroVironment's rotor blade demonstration model and test apparatus, claiming that the specifications are a confidential "commercial interest." Exhibit 7, p. 5. Yet, Defendants and AeroVironment published these very specifications in their own scientific papers and multiple scientific journals. *See* Exhibit 1D, pp. 1-2, 10-12 (describing rotor size of 1.21 meters and vehicle weight of 1.8 kg and showing pictures of demonstration models and test apparatus); Exhibit 23, pp. 2-3, 13; Exhibit 24, p. 1, 2 (table 1), p. 3 (table 3). In addition, as described in its own publications, AeroVironment built and tested prototypes of the Mars Helicopter as part of a government-funded science demonstration on Mars and explicitly not for commercial purposes. *See* Exhibit 24, p. 1.

81. Furthermore, AeroVironment has long asserted an affirmative defense to patent infringement pursuant to 28 U.S.C. § 1498 claiming that it designed and built both the Mars

Helicopter Ingenuity and the Terry helicopter for the Government with the Government's authorization and consent and that it has no commercial interest in the technology. *See* Exhibit 31, p. 3. AeroVironment argues on appeal to the Federal Circuit that JPL contracted with AeroVironment to use Terry on the Mars Helicopter program under a contract containing the same authorization and consent given for the work on Ingenuity and that Terry has never been sold commercially. *See* Exhibit 34, p. 16. According to AeroVironment, "There is no dispute that AeroVironment is not selling Terry, offering Terry for sale, or making substantial commercial use of Terry." Exhibit 34, p. 39.

82.     If any doubt remains as to AeroVironment's lack of "commercial interest" in Terry or the inapplicability of exemption b(4), on April 24, 2024, the Government filed an Amicus brief in the Arltons' appeal to the Federal Circuit stating, "Although the government did not submit a Statement of Interest as to Terry in the district court, … to the extent any doubt remains, the United States hereby provides its authorization and consent [for Terry] through its participation in this appeal." Exhibit 35, p. 18.

83.     Thus, there is no basis for the Defendants' improper assertion of the aforementioned exemptions which violate both the spirit and letter of the FOIA.

84.     The public documents provided to the Court as exhibits hereto are by no means exhaustive. Defendants and AeroVironment have published innumerable technical papers, news articles, and pictures describing the development and operation of the Mars Helicopter Ingenuity and many more can be furnished to the Court upon request. Thus, the foreseeable harm to Defendants and AeroVironment in releasing the requested records is nil, but the information contained in these documents are essential to account for the gaping holes in Defendants' story about the purported difficulties of flight on Mars and expose Defendants' enormous waste of public funds.

## EXHAUSTION OF REMEDIES

85.    Plaintiff has now exhausted his administrative remedies under the FOIA and requests the Court to review Defendants' inadequate and improper responses to his information requests. In filing his FOIA request, Plaintiff followed proper procedures and relevant agency regulations. Plaintiff also properly filed an Administrative Appeal in February 2023, provided supplemental information to facilitate NASA's appellate review process in June 2023, identified easily correctible errors in NASA's final determination letter in November 2023, and has provided JPL ample time to comply with NASA's remand. *See* Exhibits 5, 7, 9; *see also* Exhibit 8, pp. 1-2.

86.    Yet, Defendant JPL has failed to fully comply with NASA's final determination letter dated November 2, 2023, remanding many portions of Plaintiff's request back to JPL for further processing. Significantly, JPL has not addressed or corrected *any* of the errors Plaintiff identified in NASA's final determination letter.

87.    NASA's final determination letter expressly states, "This is NASA's final determination of your appeal. Pursuant to 5 U.S.C. § 552(a)(4), you may seek judicial review of this determination." Exhibit 8, p. 14. Accordingly, Plaintiff now seeks judicial relief to compel immediate release of all improperly withheld records.

88.    In addition, failure by Defendants to act within the statutory time limits constitutes constructive exhaustion of administrative remedies with respect to Plaintiff's request as a matter of law pursuant to 5 U.S.C. § 552(a)(6)(C). On November 2, 2023, NASA directed Defendant JPL to finish processing Plaintiff's FOIA request; however, since that date JPL has released only a single subcontract that could have been released two years ago. Further, Defendants have improperly redacted the records they have released, and have yet to release any information related to significant portions of Plaintiff's request.

**CLAIMS FOR RELIEF**

89.    Plaintiff has properly requested records within the possession, custody, and control of the Defendants through FOIA Request 22-JPL-F-00004, FOIA Appeal 23-00009-A-OGC and associated supplemental information. *See* Exhibits 4, 5, 7, 9.

**Count I: Failure to Timely Respond to FOIA Request**

90.    On November 2, 2023, NASA directed Defendant JPL to process Plaintiff's FOIA request. Since that date, JPL has produced only one commercial subcontract in Defendants' eighth Interim Release. Defendants' eighth Interim Release letter dated February 22, 2024, advised Plaintiff that "processing is not yet complete for this request." Exhibit 11, p. 3. Thus, Defendants concede that JPL has failed to fully comply with NASA's final determination letter dated November 2, 2023, remanding many portions of Plaintiff's request back to JPL for further processing.

91.    Plaintiff submitted his original FOIA request more than two and a half ago, and Defendant has still has not meaningfully responded to much of Plaintiff's request. Defendants' failure to respond to Plaintiff's requests within the statutory time period violates the FOIA, 5 U.S.C. § 552(a)(6)(A). *See, e.g.,* Exhibit 8, pp. 13-14 (listing unreasonable delays in JPL's responses).

92.    Defendants' failure to make records promptly available in response to Plaintiff's requests and Defendants' own remand on appeal further violates the FOIA, 5 U.S.C. § 552(a)(3)(A).

**Count II: Improper Withholding of Records**

93.    As of the date of this Complaint, Defendants have failed to notify Plaintiff of any determination regarding whether they will fully comply with Plaintiff's FOIA request, including the scope of records Defendants intend to produce, or the scope of records they intend to withhold, and the reasons for any such determination.

94.     Many of the records produced by Defendants thus far have included improperly claimed exemptions. Specifically, Defendants have repeatedly and improperly asserted exemption 3, exemption 4, and exemption 6 to justify withholding records containing information that is already in the public domain. *See* Exhibit 8. Moreover, many of Defendants' exemptions are predicated on AeroVironment's "commercial interest," a commercial interest which it has actively denied possessing. *See* Exhibit 8, p. 5 (withholding information based on AeroVironment's commercial interest); Exhibit 24, p. 1 (explaining that "the Mars Helicopter is intended to demonstrate the technologies needed for meaningful planetary exploration" not commercial sale).

95.     As a matter of law, no exemption protects the records sought by the Plaintiffs from disclosure and the Defendants have improperly claimed the exemptions to prevent disclosure that is mandatory under the FOIA.

96.     Through continued delay and outright failure to properly respond to Plaintiff's lawful requests for records, and their improper withholding of such requested records, the Defendants have failed to comply with the FOIA's prescribed requirements for public availability of records in violation of 5 U.S.C. § 552(a)(3)(A).

97.     In addition, the public benefit of disclosing far outweighs any potential harm of disclosure.

98.     U.S. taxpayers have invested heavily in the Mars Helicopter program even though there was no budget for a helicopter drone in NASA's original 2020 mission to Mars and no scientific reason to develop one. In 2013, JPL and AeroVironment initially requested funding to develop their Heli-Scout drone, but their proposal lacked scientific merit and was not funded by NASA. Yet, just two years later in 2016, JPL received **$41,813,467** in public funds to continue developing a helicopter drone for Mars despite the fact that none of AeroVironment's designs were stable or controllable. *See* Exhibit 20, p. 3 (describing increase in funding in November 2016 to support Mars 2020 mission). Congress ultimately appropriated more than **$85 million** in public funds for the Mars Helicopter program, which culminated in a series of demonstration flights on Mars between 2021 and 2023 using the Arltons' patented technology.

24

99.    The Defendants have widely publicized their development efforts and described the first flight on Mars by the Ingenuity as "the Wright brothers' moment for Mars." Not surprisingly, the Defendants have received wide public support for their efforts and garnered numerous prestigious industry awards including the 2021 Collier Trophy for the "greatest achievement in aeronautics or astronautics in America." *See* Exhibit 28.

100.    But the Defendants have misled the public for years. According to the available evidence, JPL's super-computer flight controller − a byproduct of Keennon's faulty helicopter designs and JPL's inexperienced engineering team − was entirely unnecessary for a demonstration flight on Mars and was an enormous waste of public funds.

101.    Further, the Tiger Moth drone had already been developed and tested by the Navy, Air Force, Army and Special Operations Command long before Keennon built his first rudimentary stick-like prototypes in 2014 that crashed spectacularly at JPL. Like the Mars Helicopter Ingenuity, the Tiger Moth drone was capable of flying in the Martian atmosphere. Unlike Ingenuity, however, the Tiger Moth was ready to perform an actual science mission on Mars instead of a simple hover demo. Taxpayers have a right to understand why public funds were invested in Defendants' "new" drone technology when a functionally identical drone (i.e., the Tiger Moth) had previously been developed with public funds in numerous SBIR programs to meet strict military requirements and was readily available and known to the Defendants.

102.    In 2023, JPL awarded AeroVironment **$10 million** to start developing a new Sample Recovery Helicopter based on the design of the Mars Helicopter Ingenuity for a future mission to Mars. Taxpayers have a right to understand why AeroVironment continues to receive public funds for new helicopter designs when none of its prior designs worked and both the Mars Helicopter Ingenuity and the Sample Recovery Helicopter rely on the Arltons' patented technology.

103.    In total, Congress has already appropriated more than **$85 million** in public funds for the Mars Helicopter program and NASA is currently requesting significantly more funding for two Sample Recovery Helicopters as part of a proposed **$11 billion** mission to Mars in 2030.

Complete and accurate records are necessary for Congress to fact-check technical and financial information provided by Defendant and its subcontractors and to exercise good stewardship of public funds.

104.    Defendants have already released volumes of information related to the development and operation of the Mars Helicopter Ingenuity and Terry and will not be foreseeably harmed by any further release. *See, e.g.*, Exhibits 13, 18, 21-25 (demonstrating extent to which Defendants and their subcontractors have publicly released technical, financial and other information including the identities of personnel involved). Plaintiff's requests for records are designed to validate the Defendants' published development timeline and technical claims related to flight on Mars as well as to elicit additional details regarding the records already released. Thus, the public interest and benefit in releasing the requested records far outweigh any foreseeable harm to the Defendants and their subcontractors, including AeroVironment. The American public deserves to know how its tax dollars are being spent.

### Count III: Inadequate Record Search

105.    Plaintiff has demonstrated that the requested records exist and are in the possession of Defendants. Under the FOIA, Defendants are required to respond to Plaintiff's FOIA request by making reasonable efforts to search for the records requested. 5 U.S.C. § 552(a)(3)(C). Defendants have violated their obligations under the FOIA by failing to conduct an adequate search for records responsive to the FOIA request.

### Count IV: Failure to Produce Segregable Information

106.    Defendants have improperly released records with large block redactions and pages withheld in full. *See, e.g.,* Exhibits 32, 33 (showing block redactions on documents produced by Defendants), Exhibit 10, p. 2 (listing 137 pages withheld in full). Defendants' failure to disclose any servable, non-exempt portions of responsive records in response to Plaintiff's requests violates the FOIA, 5 U.S.C. § 552(b) and 5 U.S.C. § 552(a)(8)(A)(ii).

## CONCLUSION

107.     As a result of the denial of access to the requested records, Defendants continue to violate the FOIA and Plaintiff has a right to judicial relief in this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.     Expedite its review due to the significant time that has already elapsed since the original request, the historical significance of the subject matter, and the immediate public interest in and benefit of the records requested;

2.     Issue an order requiring Defendants to:

    a.  Conduct a thorough search for records responsive to Plaintiff's FOIA requests;

    b.  Immediately process all responsive records for release;

    c.  Produce a Vaughn index of any responsive records or portions of responsive records being withheld under a claim of exemption; and

    d.  Produce by a date certain all non-exempt records responsive to Plaintiff's FOIA requests.

3.     Award Plaintiff's reasonable costs and attorney's fees incurred in this action; and grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Michelle N. Bradford*
DC BAR #491910
BARNES & THORNBURG LLP
555 12th Street N.W., STE 1200
Washington, DC, 20004
Phone: (202)-408-6922
Facsimile: (202)-289-1330
MBradford@btlaw.com